UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK                    **FOR PUBLICATION**
-----------------------------------------------------------------
In re

     Donna M. Bene                                   Case No. 03-14328 K

                           Debtor
-----------------------------------------------------------------
Donna M. Bene

                     Plaintiff

      -vs-                                            AP No. 08-1167 K

Educational Credit Management Corporation

                    Defendant
-----------------------------------------------------------------


OPINION, DECISION AND
ORDER DISCHARGING STUDENT LOAN DEBT


Brad Davidzik, Esq.
Jeffrey Freedman Attorneys at Law
424 Main Street, Suite 622
Buffalo, NY   14202-3593

Attorney for Plaintiff


Stephen M. O'Neill, Esq. PLLC
707 West Delavan Avenue
Buffalo, NY   14222

Attorney for Defendant

SYNOPSIS

To some extent, this case is about choices that student loan debtors made long before seeking discharge of student loans in bankruptcy court.

Three prior rulings by this writer are implicated - - *Melton, DeRose* and *Kraft*.   In *Melton*, this Court held that a decision to stay poor <u>after</u> bankruptcy despite higher-paying options will not satisfy the *Brunner* Test, no matter how noble the reasons for that choice.  For example, a skilled physician who chooses to remain a missionary after bankruptcy will not prevail under *Brunner*.

*DeRose* involved a choice by a well-paid and debt-free Registered Nurse to enter chiropractic school at age 45.  She undertook substantial student loan debt and became a chiropractor.  She discovered that that profession did not provide the income necessary to repay the debt in the normal way.  This Court ruled that she could not complain of that fact, despite her age (54) at the time of trial.  She could not be heard to complain of Ford Program options that would <u>not</u> be an "undue hardship" for her despite the fact that she could not repay the debt in her lifetime.

*Kraft* involved a debtor who drove a school bus, hoping to find a job in her chosen field - - the travel industry.

Here we have a debtor who, at age 33 back in 1981, had no higher education and then set-out for a college education at one of our fine local institutions - - Canisius College.  She was never able to complete that education for reasons to be discussed later, and never received a

degree or professional diploma or license.

Ms. Bene never chose to be poor; never chose to leave a good-paying vocation for higher education that was not sufficiently profitable; never got a degree or diploma, because she chose to care for her parents and sacrificed the education that she borrowed-for; paid on the student loan debt what she could for 25 years; has worked twelve years on an assembly line (and has now received a layoff notice at age 64); has no other debt; and now as a last resort seeks to discharge $56,000 in student loan debt (the original borrowing totaled $16,931.00 back in the '80s), rather than indenturing herself to the William D. Ford Program for the next 25 years.

Consequently the question before the Court is whether the Educational Credit Management Corp. may, by offering better and longer repayment terms for student loans through the William D. Ford Program, "finesse" the words and the intention of 11 U.S.C. § 523(a)(8) as interpreted in 1987 by *In re Brunner*, 831 F.2d 395 (2nd Cir. 1987).

This Court finds that such *ex post facto* approach is not supportable as against this particular Debtor, under 11 U.S.C. § 523(a)(8), given that her last borrowing was 25 years ago.

Stated in another way, one important cornerstone of the *Brunner* test was the "bargain" between a student loan borrower and the governmentally-insured lender. There can be no doubt that the United States changed that "bargain" from time to time (see fn. 15 below) in such ways as to make it no "bargain" at all.

Many circumstances have caused student loan debtors to file for bankruptcy relief and to sue for discharge of student loan debt under § 523(a)(8). Maybe they were unable to complete their education. Maybe they completed their education but it was not as lucrative as

they supposed.  Maybe illness or injury blocked fulfillment of the promise or expectation of their education, even when fully achieved.

It is this Court's finding that ECMC invites the Court to cross the bar   suggested by Collier (discussed later)  to the effect that the Ford Program might imply a repeal of § 523(a)(8).  This Court does not accept that invitation.  The changes in the ways that a former student may "satisfy" a student loan, without ever "repaying" it, do not supplant 11 U.S.C. § 523(a)(8) and do not supplant the *Brunner* interpretation of the statute.

## SUMMARY

In 1987, the *Brunner* Court confronted 11 U.S.C. § 523(a)(8) and the meaning of "undue hardship" in repaying a student loan.  It used words and phrases that do not have the same meaning now, just 25 years later.  That is because some were sociological terms, not legal terms, though they have become legal terms in the minds of some litigants, especially student loan lenders.

*Brunner* has achieved "biblical" status among such litigants, and has consequently spawned some myths - - myths that some courts have adopted as law.  This writer explains below why the *Brunner* decision's words of 1987 must be reconciled with the words of today.

That decision used the words "poverty" and "minimal standard of living."  Those words have a different meaning today.  It also used the phrase "the repayment period," as if that were a "term of art" meaning 8 to 10 years.  Now it can be 25 years.  This Court must attempt to extract the substance of *Brunner* from its outdated language.

Were this case about *Brunner* alone, it would be daunting enough. But something else has intervened to throw analysis of, and obedience to, that binding decision into disarray. Specifically, the current version of the William D. Ford Program collides with *Brunner*. The last student loan that this Debtor (Ms. Bene) borrowed was on August 31, 1987. From August 26, 1981 to that date, she borrowed $16,931.00. Six years of borrowing, a long time ago. She never completed her education, for very good reasons.[1] As of the day of trial her obligation was $56,298.70. Because she availed herself of periods of deferral and forbearance (and also the current Chapter 13 case in which she has completed her Plan), she has made only $2400 in payments on this debt in the nearly 25 years since it first became due. That, however, was the best she could do.[2] The latest incarnation of the Ford Program offers her debt-forgiveness if she completes a 25-year program of affordable payments. That was not available when *Brunner* was decided in her last year of borrowing, 1987 (coincidentally). And since the intervention of such options it seems that the Second Circuit has not had occasion to revisit *Brunner* in any way that would guide this Court.[3] The commentators have, however, so revisited.

---

[1]This Court's decision in *In re DeRose*, 316 B.R. 606 (Bankr. W.D.N.Y., 2004) is distinguished on several bases. Ms. DeRose became a chiropractor at age 50, and discovered that she was earning not much more than she earned as a Registered Nurse before she borrowed, then she claimed her advanced age to satisfy the *Brunner* Test. This Court said "This case is highly unusual . . . . Nearly all of the [her student loan debt] never entered payment status before [she] filed her chapter 13 case." That aligned Ms. DeRose with Ms. Brunner, as we shall see. Discharge rather than an unwelcome burden. Bankruptcy as a first resort rather than a last resort. The present case is different in that and other ways, as explained below.

[2]One exception - - a $25,000 lump-sum payment she received in 1986 and chose to devote to her parents' care – will be discussed later.

[3]It is important to note that the Second Circuit has never revisited *Brunner* in published opinions, although it observed in *In re Traversa*, 2011 WL 5110214 that the 3rd, 5th and 11th Circuits have adopted the "*Brunner* Test." In other words, any extrapolations upon *Brunner* in those other Circuits do not bind this Court, because the Second Circuit did not "adopt" them. But see footnote 12 below - - the Circuit might have revisited *Brunner* in unpublished

For example, Collier states **"Courts must . . . be careful not to treat the enactment of the statute authorizing the United States Department of Education to accept an income-contingent repayment plan as an implied repeal of § 523(a)(8) of the Bankruptcy Code. . . .  At bottom, the Bankruptcy Code requires Bankruptcy Courts to decide how much personal sacrifice society expects from individuals who accepted the benefits of guaranteed student loans but who have not obtained the financial rewards they had hoped to receive as a result of their educational expenditures."**  Collier on Bankruptcy, 15th Edition ¶ § 523.14 [2].]

Refining its earlier attempt in *DeRose*, this Court finds that it must first determine whether the Debtor would pass the *Brunner Test* <u>but for</u> the options currently available to her under the Ford Program.  As set forth below, the Court finds that Ms. Bene has passed that test.

Once so ruling, this Court must then attempt to address the intervening current version of the Ford Program in *Brunner* terms.   Although it is permissible that this Court <u>distinguish</u> *Brunner* as to issues posed by the Ford Program, the Court seeks to reconcile *Brunner* with the current version of the Ford Program.  In doing so, this Court will borrow analyses from other jurisdictions (some of which are not bound by *Brunner*) where it has been concluded that the availability of the Ford Program is just one of a "totality of factors" that the Court must apply in a § 523(a)(8) analysis.  (See, e.g. *Long v. Educational Credit Mgmt. Corp.* (*In re Long*), 311 F.3d 549 (8th cir. 2003)).

In sum, the Court will conclude that the *Brunner Test* comes first, and that the

dispositions.

Debtor has passed that test. Then comes the effect of changes in the repayment options offered by the current version of the Ford Program. The Debtor here passes a "totality" test as well. The two paths do come together under a *Brunner* analysis.

(The Court is not unmindful of the fact that taxpayers (including this writer) bear the ultimate burden of the debt at issue here. It will address that policy concern below as well.)

## I. INTRODUCTION

This matter is governed by the binding decision in *In re Brunner*, 831 F.2d 395 (2nd Cir. 1987). In that case, two great "public 'goods'" came into collision: the federally-guaranteed student loan program (which made higher education or specialized training available to persons without wealth or creditworthiness), and the Biblically-inspired notion (Deut. 15) of forgiveness of debt, enabling a "fresh start." Now a third "great good" collides with the *Brunner* court's resolution of the first head-to-head conflict - - the current version of the William D. Ford Program[4] which makes it harder for a student loan borrower to meet the "Brunner Test" to obtain a discharge of that debt in bankruptcy. It does so by forgoing "repayment" of the debt, and substituting "satisfaction" of the debt after a long period of "affordable payments."

(Until fairly recently (perhaps in 2003), the Program could offer greatly reduced repayment terms, but could not offer forgiveness of unpaid balance. Now it can do so after a

---

[4]The Ford Program is not privately funded or subsidized. There is no "Foundation" behind it. It seems that there was enacted a "new" name (as of 1993) for what was known as the National Direct Student Loan Program. (The renaming seemingly honors a long-term Congressman from Michigan who championed expanded educational opportunities for persons of lesser means, and who died in 2004, but had left Congress in 1995.

student loan debtor completes a long-term repayment period, paying what she can afford. (The Debtor here is offered a 25-year term.))

This case permits the Court to expand upon its own interpretation of the commands of the *Brunner* decision, to consider possible misinterpretations of this Court's decision in *Melton* (187 B.R. 98), and to place this Court's prior ruling in *DeRose* in a broader context.

The Court first lays *Melton* to rest. Apparently, dictum in *Melton* has been held out to some courts as standing for the proposition that if a debtor, in the past, made a noble moral choice to remain poor despite the existence of student loan debt, that choice will not relieve the debtor from student loans under the *Brunner* Test. Nothing could have been further from this writer's mind. Even in the face of existing debt, people make bad or immoral choices, use bad judgment, make mistakes. The Bankruptcy Code forgives most of those. What 11 U.S.C. § 523(a)(8) does not forgive is a choice to become poor, or to remain poor, **after** bankruptcy, while better earning options are available and student loan debt remains unpaid.

In the case at Bar there was no mistake, no bad judgment, and no immoral choice. The Debtor simply chose to care for her infirm parents and sacrifice the completion of her education. This was a choice she made before she made her last student loan borrowing in 1987. Today, Ms. Bene (pronounced "Be'- nay") has completed her Chapter 13 Plan, has paid only $2483.81 over the years since 1987, and faces $56,298.70 in remaining student loan debt, having borrowed only $16,931.00 during the years 1981 to 1987. (The difference is accrued interest.)[5]

---

[5]This is not a criticism of interest rates. It is simply a fact, 25-years-removed from the last borrowing in 1987.

This Court holds that the *Brunner* test looks to the present and the future, not to the distant past. The test requires that the Court determine whether present circumstances will continue for a time into the future for reasons outside a debtor's control. A moral choice that some debtor made 24 or more years ago to forego opportunities she then had to improve herself, and thus to optimize her potential to earn enough money to repay her student loan debt, is not relevant to a *Brunner* analysis.

This Court also holds that the same is true as to a moral decision to devote a lump sum of money to the care of a debtor's parents two decades ago, when that money would have paid-off the pre-existing loan debt, as discussed below.

**This case is an ideal case because she has no other debt, has not had a credit card in over 20 years, has no previous bankruptcies, is 64, single, no dependents, apparently never married, no disabilities, has been an assembly-line worker for 12 years, lives so modestly that her only phone is a pre-paid cellular phone (no "land-line"), and has no television at all (let alone <u>cable</u> T.V.), no entertainment expenses (she testified that she is active in her church and "reads a lot"), no retirement funds, no savings, no health care plan, lives alone in an apartment that costs $515/mo., and has received a notice from work that she will be laid-off in 6 to 12 months. Her monthly expenses average $1526. Her monthly wages are $1591, net of taxes. And this is a Chapter 13 case, not a Chapter 7 case: she completed a 5% Plan solely for the student loan debt.**

The Debtor is before this Court <u>only</u> because of very old  student loan debt, and

only as a "last resort."

   There can be no more important case in which to consider *Brunner* and *DeRose*

again.


## II.  THE ISSUES

   (1) What is a "minimal standard of living" under the first prong of *Brunner*?  (2)

Assuming that the Debtor might appear to satisfy the first prong, may the lender avail itself of a

<u>long-past</u> moral <u>choice</u> by the Debtor that left her among the "working poor?"  (3) What role

does the availability of the current version of the William D. Ford Program play within the

*Brunner* analysis?  (4) The Debtor faces imminent job loss, and at 64 years of age, what does that

mean under *Brunner*?  (5) In 1986, her parents transferred $25,000 of their money to her as part

of Medicaid or Medicare planning.  It was not a gift, but constituted money already earned by her

for her care of them.  She chose to devote that money to her parents' care, rather than to paying-

off her student loan debts or completing her higher education.  How does that figure into a

*Brunner* analysis?

   Defendant ECMC has skillfully sought to spread all of the above questions across

all three prongs of the *Brunner* test, as it did in *DeRose*.   The Court finds that a useful analysis

and understanding of the present case is not advanced by using the three-prong *Brunner* test at

the outset, though the Court must obey *Brunner* in the end.


## III.  BRUNNER (<u>NOT THIS DEBTOR, MS. BENE</u>)

The facts of *Brunner* were these (as found by the district court (46 B.R. 752)).

Ms. Brunner received her B.A. Degree in 1979 and a Masters Degree in Social Work in May of 1982. About seven months later she filed her Chapter 7 petition. Her student loans, $9,000, were 80% of her total debts. Two months after that, the nine-month grace period (after receiving the Masters Degree) expired, and she commenced her Adversary Proceeding against the Higher Education Services Corp. ("HESC") under 11 U.S.C. § 523(a)(8) seeking discharge of the student loans. After a bench trial, the bankruptcy court discharged the loans. HESC appealed. (HESC was "Higher Educational Services Corp."). Her attorney apparently then withdrew. She was *pro se* on the appeal before the district court, and no brief was filed by her or for her. Rather than treating this as a default under the briefing schedule, the district court assumed that she opposed (apparently she did not appear on the appeal) and proceeded to the merits.

The district court cogently examined the legislative history of § 523(a)(8), finding very little guidance there regarding what might be "undue hardship" as opposed to mere "hardship." That court then found some guidance from courts in other jurisdictions. It adopted the "minimal standard of living" standard from the 8th Circuit Court of Appeals. Then it said this: "After all, it is not unreasonable to hold that committing the debtor to a life of poverty for the term of the loan - - generally ten years - - imposes 'undue' hardship."[6] [Emphasis added.]

(For purposes of the case at Bar, the first lesson to be learned from that decision is

---

[6]This Debtor currently is offered a 25-year-term under the Ford Program, making it harder for her to satisfy any prong of the *Brunner* test. Accepting the program will obligate her until she is 89 years of age, and even then she will not have "repaid" the debt; rather she will have "satisfied" the terms for a release as to the remaining balance.

that the district court in *Brunner* was not equating "minimal standard of living" with "poverty." It

was simply setting an extreme beyond which further inquiry is not required - - committing a

debtor to payment of the student loans in a way that left a life of <u>poverty</u> for an extended period

of time clearly <u>would</u> <u>be</u> "undue hardship." But requiring the debtor to <u>maintain a "minimal</u>

<u>standard of living"</u> for an extended period of time <u>while</u> <u>paying</u> the student loans might not be a

hardship that is "undue.")

      The district court then looked to the question of what the future might hold for

Ms. Brunner. It said, of course, "Predicting the future . . . is never . . . easy." Regrettably (from

this writer's point of view), the district court in *Brunner* looked to the bankruptcy court decision

in the case of *In re Briscoe*, 16 B.R. 128 (Bkrtcy. S.D.N.Y. 1981). That bankruptcy court said

"Dischargeability of student loans should be based upon the certainty of hopelessness, not simply

 present inability to fulfill financial commitment."[7] Although the district court in *Brunner* stated

that that sad statement is "perhaps the best articulation" of the forward-looking aspect of its

inquiry, the district court fortunately pronounced a much more temperate holding: The debtor is

"required to demonstrate not only a current inability to pay, but additional circumstances which

strongly suggest that the current inability to pay will extend for a significant portion of the

---

[7]This writer's criticism of *Briscoe* has been published. See *In re Doherty*, 219 B.R. 665 (Bankr. W.D.N.Y., 1998). When Congress added discharge of debts to the bankruptcy laws, it was borrowing from the Book of Deuteronomy. Deut. ¶ 15. It has become axiomatic that we are courts that provide a "fresh start" to an honest debtor. It is true that student loan debts are justly distinguished from the generality of contract debts because, among other things, they are available even to un-creditworthy people for their own self-improvement or that of their child, and they may be guaranteed at taxpayers' expense. But if Congress ever were to require this writer to instruct a student loan debtor that he or she must carry the burden of proving that he or she has a "certainty of hopelessness," this writer would retire. There would be no way to reconcile such a command with the notion of a "fresh start" for honest debtors. Some debtors, faced with such a standard, would not seek bankruptcy relief at all, but rather would choose to be discharged by the Highest Authority. (Suicide is found among those who are not permitted forgiveness of debt, and its fresh start.)

repayment period of the loan." (In those days, the typical repayment period was 10 years).

Then the district court borrowed from other courts and sought "unique" or "exceptional" circumstances that might reflect upon the future of the debtor - - circumstances such as illness of the debtor, the number of dependents, and special needs of dependents.

Finally, the district court, again borrowing from case law from other jurisdictions, said "It is proper to require a debtor to show that he or she has made good faith efforts to repay the loan and that the forces preventing repayment are truly beyond his or her reasonable control."

It is important to note that this writer fully agrees with the following statement by the district court in *Brunner*:

**In connection with the showing of good faith and circumstances beyond the control of the debtor several courts have permitted debtors to discharge their loans upon a showing that the education for which the loan paid has been of little use to them. . . . Consideration of this factor is not only improper, it is antithetical to the spirit of the guaranteed loan program. As described in more detail infra, the loan program grants aid regardless of the financial stability of the debtor or the wisdom of his or her individual choice to pursue further education. Consideration of the "value" of the education in making a decision to discharge turns the government into an insurer of educational value. Those students who make wise choices prosper; those who do not seek to discharge their loans in bankruptcy. This is wholly improper.**

The courts which consider this factor seem to view it as a way to punish institutions for forcing on students loans which are not in their best interests. . . .   Regardless of whether such an attitude is proper, [such] court's chosen remedy is ineffectual.  The burden is borne not by the institution but by taxpayers, who absorb the cost of the default.  As noted in [*In re Powellsen*, 25 B.R. 275], a student loan <u>is</u> an investment, but it is for the borrower, not the taxpayers, to evaluate the wisdom of the investment and bear the risks and burdens if the investment proves improvident. . . .

The effect of these requirements is to make student loans a very difficult burden to shake without actually paying them off.  While this result may seem draconian, it plainly serves the purposes of the guaranteed student loan program.  When making such loans, the government (as guarantor) is unable to behave like ordinary commercial lenders, who may, after investigating their borrower's financial status and prospects, choose to deny as well as grant credit and may adjust the interest rate which they charge according to their judgment as to the likelihood of repayment.  The government has no such luxury.  It offers loans at a fixed rate of interest, and it does so almost without regard for creditworthiness.  Indeed, because it bases its loan decisions in part on student need, it arguably offers loans selectively to the worst credit risks.

Because of this enlightened social policy, those whose past work or

**credit record might foreclose them from the commercial loan market are able to obtain credit at subsidized rates to advance their education. Those who might obtain loans only at exorbitant rates are similarly able to obtain low cost, deferred loans. In return for this largesse - - and it is undeniable that guaranteed student loans have extended higher education to thousands who would otherwise have been forced to forego college or vocational training - - the government exacts a *quid pro quo*. Through § 523(a)(8) it commits the student to repayment regardless of his or her subsequent economic circumstances. In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances. . . . This is a bargain each student loan borrower strikes with the government. Like all bargains, it entails risks. It is for each student individually to decide whether the risks of future hardship outweigh the potential benefit of a deferred-payment education.**

This was well-stated, in this Court's view, and has often been applied here. (See *In re DeRose*, 316 B.R. 606; *In re Doherty*, 219 B.R. 665; *In re Oswalt*, 215 B.R. 337; *In re Melton*, 187 B.R. 98; *In re Kraft*, 161 B.R. 82.)

Having identified three bedrock principles, the district court examined the first one as it applied to Ms. Brunner.

Ms. Brunner's age was not known to the district court. The decision by that court was rendered in February of 1985. Ms. Brunner had entered college in 1972, and between 1972

and the time of the <u>lower</u> court's decision she had supported herself through a variety of full and part-time jobs, student loans, and educational stipends.  She had no dependents.  During the decade prior to the bankruptcy court hearing, her greatest annual income was $9,000.[8]  When the bankruptcy court heard her case in 1983, her rent was $200 per month, she was receiving $258 per month in public assistance, $49 per month in food stamps, and Medicaid.  The district court said this,

> **"She had been receiving this aid for approximately four months prior to the hearing [in the bankruptcy court].  Her testimony as to her source of support prior to that time was vague.  At the time of the hearing [in the bankruptcy court], she possessed a bank account holding $200, but two months prior to the hearing she withdrew $2400 from her savings to purchase a used car.  Upon her filing for bankruptcy four months prior to the hearing, her student loans constituted 80% of her total indebtedness."**

The present Court finds it important that the district court in *Brunner* then stated this:

> **Appellee [Ms. Brunner] testified that she had sent out "over a hundred" resumes in search of employment <u>in her chosen field of work</u> but was unsuccessful.  She noted that many of her classmates found themselves**

---

[8] In 1972, this writer, who graduated law school in 1971, accepted a job as a lawyer at $10,500 per annum here in Western New York.  It was not an untypically low starting salary.  Hence, Ms. Brunner's $9,000 year was not then as meager as it sounds now, unless that was earned closer to 1983 when the bankruptcy court ruled in her favor. (Perhaps she earned far less earlier.)

similarly unable to find such jobs.  The extent to which she had attempted to find work *underline*outside*underline* her field was unclear.  In response to her lawyer's inquiry [before the bankruptcy court] as to whether she had sought clerical or other jobs, she replied, "I don't have secretarial skills, but I have applied <u>for any position that I could find."  She did not recount any specific jobs which she had sought and been refused.</u>  On cross-examination she conceded that she had done clerical work in the past.  Although appellee was seeking a therapist for treatment of anxiety and depression due in part to her unemployment, she testified that she was capable of working.

In a brief oral ruling, the bankruptcy judge found that "she is not presently employed; prospects in the future do not look bright . . . there does not appear to be any great demand for psychologists or social workers, or at the least . . . there is not anything available.  She has a psychological impairment, as well as a lack of future employment opportunity. . . .  I find ... that the paucity of income that the debtor receives from public assistance would not be available to her to repay, and it would work an undue hardship upon her to have to dip into those funds."  As a consequence, the judge discharged the loans.  [Emphasis added.]

Then the district court in the *Brunner* case rejected as "clearly erroneous" the bankruptcy judge's finding that Ms. Brunner possessed a "psychological impairment."  There was no evidence in the record that her depression and anxiety impaired her capacity to work.  The

<u>district</u> court said "<u>she has no 'impairment' in any relevant sense of the word.</u>"

Having set aside the bankruptcy court's finding in this regard, the district court said that Ms. Brunner

> "**appears to be a woman who is unlikely to find a job in her <u>chosen</u> field of work in the near future. However, she is an apparently healthy, presumably intelligent, and well-educated woman. Although she claimed to be unable to find any other type of work, the evidence presented at the hearing is too thin to support a finding that her chances of finding any work at all are slim, and I do not read the bankruptcy judge's decision as so finding. She has no dependents or any other extraordinary burdens which would impair her finding other work, or, once it is found, making it unlikely that she can both support herself and pay off her student loans.**" [Emphasis added.]

Next the district court in *Brunner* made successive findings that some scholars might say should have ended the inquiry at <u>each</u> point. First the district court stated: "In short, [Ms Brunner] <u>at most</u> proved that she is currently - - or was at the time of the [bankruptcy court] hearing - - unable both to meet her minimal expenses and pay off her loans." In a lengthy footnote, the district court stated that

> "**the bankruptcy judge failed to require, and [Ms. Brunner] failed to submit, a statement of expenses and income. The testimony at the hearing, accepted at face value, indicates that [Ms. Brunner] had been surviving for several months on monthly income of $107 in food stamps and cash above the cost of**

**her rent.  From this $107 appellee must have paid for food, clothing, utilities, entertainment, and the costs of registering, insuring, and maintaining a $2400 car.  It seems _incredible_ that this sum could stretch so far, _indicating that [Ms. Brunner] had sources of income which she failed to reveal._  It must be remembered that although [Ms. Brunner's] budget was thin, she nevertheless felt financially secure enough to spend her life savings on a car one to two months prior to the hearing."** [Emphasis added.]

That might have ended the matter.  The district court nonetheless chose to presume that Ms. Brunner passed the first prong, and proceeded to the second prong that it had formulated.  It stated "that satisfying the first prong" (which Ms. Brunner was only _assumed_ to have accomplished) cannot support a finding that the failure to discharge her loans will impose "undue hardship."  The lead case cited for that proposition was the unfortunate _Briscoe_ case, but the analysis proceeded.

The court found that  "Nothing in the record supports a finding that it is highly likely that her current inability to find any work will extend for a significant part of the repayment period[9] of the loan or that she has 'a total incapacity now and in the future to pay her debts for reasons not within her control.'  She is skilled, apparently capable, well, and without dependents." [Emphasis added.] This became the second prong of the _Brunner_ Test.

Then came the third prong.  The district court said "Nor has she adequately demonstrated good faith in attempting to pay off her loans.  She filed for discharge within a

---

[9]Again, it was 10 years then.  Now it is up to 25 years.

month of the date the first payment of her loans became due.  She has made virtually no attempt

to repay, nor has she requested a deferment of payment, a remedy open to those unable to pay

because of prolonged unemployment. . . .  Inasmuch as this is her primary reason for requesting

discharge, <u>initial</u> resort to the less drastic remedy of deferment would have been more appropriate

than bankruptcy." [Emphasis added.][10]

       If the test formulated by the district court was such that a debtor's failure to pass

any one of the three prongs would defeat discharge of the debt, then Ms. Brunner's case could

have been thrown out for default on the briefing schedule, or for failure to satisfy what eventually

became the "first prong" of the *Brunner* test (because her budget was "incredible"), or because

she had sought bankruptcy as a first resort rather than a last resort (what became the "good faith"

prong of the *Brunner* test), or because she had not sought jobs outside her "chosen field" and so

could not have satisfied what became the "second prong" of the *Brunner* test.  But her case

yielded a "three-pronged test" at the district court level.

       Again, Ms. Brunner was *pro se*, and was not a lawyer, but the holding was <u>later</u> to

become binding upon <u>every student loan borrower who has ever sought bankruptcy relief in the</u>

<u>Second Circuit since 1987</u>, as discussed below.

       This Court respects and admires the thoughtful scholarship and judicial temperance

that formulated a useful rule for what might have been a constant question in the Southern

District of New York.  (In 1987 that District might have had the highest per capita share of

student-loan debtors seeking discharge in bankruptcy.)  Now, this Court must turn to the <u>Circuit</u>

---

[10]This is a major distinction from the *DeRose* case, and will be more fully explained below.

Court decision in *Brunner* to determine what binds <u>this</u> Court.

The decision rendered by the <u>Circuit</u> in 1987 is very brief.  It was a one-page *per curiam*, with Ms. Brunner representing herself, *pro se*.   The Second Circuit Court of Appeals stated:

> **"For the reasons set forth in the district court's order, we adopt [the district court's] analysis.**

The Circuit Court went on, albeit briefly.  It found the first prong to be a "reasonable" inquiry.  Next, the Circuit Court also found it "reasonable" to require a showing of "additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time."

The Second Circuit, in this Court's estimation, then seems to have conflated the second and third prongs into something like a "totality of circumstances" test, although it could have ruled against Ms. Brunner on either one of those two prongs.   It said:

> **The record then demonstrates no "additional circumstances" indicating a likelihood that her current inability to find any work will extend for a significant portion of the [ten year] loan repayment period.  She is not disabled, nor <u>elderly</u>,[11] and she has, so far as the record discloses, no dependents.  No evidence was presented indicating a total foreclosure of job prospects in her area of training.  In fact, at the time of hearing, only ten**

---

[11]This Court could, but will not, base its decision in the present case upon the question of whether this 64-year-old Debtor is "elderly" or not, as discussed below.  (It later does make an alternative holding in that regard.)

**months had elapsed since Brunner's graduation from her masters program. Finally, as noted by the district court, Brunner filed for the discharge within a month of the date the first payment of her loans came due. Moreover, she did so without first requesting a deferment of payment, a less drastic remedy available to those unavailable to pay because of the long unemployment period. Such conduct does not evidence a good faith attempt to pay her loans."** [Emphasis added.]

## IV. THE PRESENT CASE, AND FINDINGS AND CONCLUSIONS

The analysis above implies, if not demonstrates, that formulation of a three-prong test applicable to <u>every</u> student loan debtor who has ever sought relief in the bankruptcy courts of the Second Circuit since *Brunner* was not <u>required</u> under the facts of Ms. Brunner's case. Further, because there was no advocacy (by a lawyer or by any *amicus*) on behalf of student loan debtors in general, or Marie Brunner in particular, it is possible that countless such debtors whose budget was not "incredible" (as the district court found Ms. Brunner's budget to be), were done a disservice.[12]

To repeat the five questions to be answered in the present case, the case of Ms.

---

[12]It may be that on one or more occasions since the 1987 *Brunner* Decision the Circuit Court has been asked by competent counsel to reconsider the *Brunner* test, with competent briefs and arguments that truly illuminate the matters discussed above, and changed circumstances. If that has not happened, then it is time for a student loan debtor's counsel to present these matters to the Circuit Court. If it has happened, and the Circuit Court rejected cogent, current arguments in an unpublished Summary Affirmance of a lower court decision based upon the *Brunner* test, this Court would have no knowledge. As noted at footnote 3, above, the published decisions of the Second Circuit Court of Appeals merely note that three other Circuits have adopted the *Brunner* test.

Bene.

     1.  What at this time is a "minimal standard of living" under the first prong of

*Brunner*?

     2.  What bearing does a long-past choice to forego education and the economic

benefits it might provide toward the payment of outstanding student debt, have within the

*Brunner* analysis?

     3.  What role does the availability of the current version of the William D. Ford

Program play within the *Brunner* analysis as regards Ms. Bene?

     4.  How does the *Brunner* test apply to the fact that Ms. Bene, at age 64, faces

imminent job loss?

     5.  Twenty-five years ago, the debtor's parents transferred $25,000 to her which

she chose to devote to her parents' care.  It was not in trust or as a gift, but rather it was to repay

her for her past services to them.  (A 1987 affidavit by her parents is in evidence as Defendant's

Exhibit A.)  She could have used it to pay off her student loans which already existed and by then

totaled only approximately $14,500.  Now that has grown to $56,300.00 because of accrued

interest.  How does that figure in to the *Brunner* analysis?

     <u>Answer to question 1.</u>  Clearly the Second Circuit did not equate "minimal

standard of living" with "poverty."  The Circuit unequivocally held that committing a debtor "to a

life of <u>poverty</u>" for an extended time into the "ten year loan repayment period" would constitute a

hardship that is "undue."  (Now the Debtor is offered a 25-year program to "satisfy," but not

"repay" the debt.)  The lender here (ECMC) argues that the "minimal standard of living"

articulated in *Brunner* is the "Self-Sufficiency Standard" published by the Center for Women's

Welfare. (That seems to be the standard used by certain non-governmental organizations and

some governmental agencies to assess a person's or family's need for subsidy or other assistance.

It seems that it has been adopted by pertinent agencies here in New York.) Under the current

standard for this county, the self-sufficiency standard for Ms. Bene is $1676 per month, before

taxes. Her current income is $1849.46 per month, before taxes. She earns $176.46 per month

above that standard. ECMC consequently argues that Ms. Bene does not satisfy the first prong of

the *Brunner* test, which is to say that it argues that she can afford to make payments on her

student loans without falling below the self-sufficiency standard. Even if the Court accepts the

premise that the "minimal standard of living" contemplated by the Second Circuit in *Brunner* is

roughly equivalent to the published "self-sufficiency" standard, this argument is flawed because it

ignores the fact that *Brunner* added service of the student loan debt to a debtor's expenses, while

ECMC does not, but for Ford Program options for very low payments and eventual "satisfaction"

of that debt, without full repayment. (This will be discussed more fully below.)

   <u>Answer to question number 2.</u>  As addressed earlier in this Decision,  ECMC has

argued that this Court's decision in the case of *In re Melton*, 187 B.R. 98 has been viewed by

some courts to stand for the proposition that a pre-bankruptcy choice by a student loan debtor to

become or to remain poor defeats a debtor's effort to discharge a student loan under any of the

three prongs of the *Brunner* test, or all three of the prongs, no matter how noble that choice.

(This relates to Ms. Bene's choice to end her education and devote her time to care of her

parents, back in 1986.)  ECMC argues that some debtors have lost their § 523(a)(8) cases as a

result.  No published decision to that effect has been found by this writer.  Assuming that

<u>unpublished</u> decisions to that effect have been rendered by some courts, the present court

expresses regret.  This writer failed in *Melton* to emphasize the difference between a pre-petition

choice and a post-petition choice.  Mr. Melton's household was "non-traditional."  He lived with

his girlfriend and her children and cared for them and provided for them.  Under public assistance

laws and regulations with which this Court has no familiarity, any effort by him to improve his

earnings (and there was no barrier to that) would reduce the public assistance to his non-

traditional "family unit."  So <u>after</u> bankruptcy he chose not to work harder or longer to pay his

student loan debt because additional earnings would reduce public assistance to his non-traditional

family unit.  In other words, he viewed it as a "wash" financially, and favored time with his loved-

ones over repayment of his student loan debt.

       This Court did not sustain that argument.  In an effort[13] to explain its ruling, the

present Court used the hypothetical of a physician who chooses to become a missionary doctor

and then seeks to discharge his or her student loans.  What this writer failed to emphasize is the

difference between <u>seeking to discharge the student loan debt in bankruptcy</u> or not so choosing.

To be more specific, there are <u>three</u> "choices" involved.  The first is the choice to become poor or

to remain poor <u>after the borrowing</u>.  The second is choosing to <u>seek discharge</u> of the student

loans in <u>bankruptcy</u>.  The third is how one chooses to live <u>after filing</u> for bankruptcy relief.  The

last presumes "options."

---

[13]This was apparently not a totally persuasive effort, as this writer has been accused of a form of bias against poor unmarried family units.  See A. Mechelle Dickerson, <u>Lifestyles of the Not-So-Rich or Famous:  The Role of Choice and Sacrifice in Bankruptcy</u>, 45 Buff. L. Rev. 629 (1997).

The first choice, if it temporally came before any consideration of bankruptcy, is forgiven in bankruptcy, especially if made twenty-four years before asking for discharge of student borrowing that was incurred before the choice to be poor was made. <u>One can hope for a future that will permit **both** the fulfillment of a noble choice **and** repayment of student loan debt.</u>

If one eventually suffers the need to seek relief from the bankruptcy court (the second choice), the third choice is the only important one. What shall he or she do in light of what the future may hold, given the discharge of other debt and the existence of student loan debt? Hypothetically (in *Melton* terms), the good doctor who became a missionary doctor could, <u>after</u> bankruptcy, choose to bring her great knowledge, of, say, illness in emerging regions, to a <u>salaried</u> position in an NGO, a governmental agency, a hospital, or into a private practice. This might permit payment of the student loans. The critical question is "Is there a higher paying option?"

The Debtor, here, Ms. Bene, has no option or choice now, and has not had such a choice for a very long time. She never got a degree. She has worked hard for 12 years on an assembly line, full-time. She makes $10.67 per hour - - $3.17/hr. above the current minimum wage after 12 years on the job. At her age (64), with no degree and no special skills in evidence, there is no option that she might choose in order to improve her ability to repay $56,000 in student loan debt.[14]

---

[14]This also distinguishes *DeRose* from the case at Bar. Ms. DeRose achieved her goal. She became a chiropractor. It turned out to be not so lucrative as she thought. She was also a Registered Nurse. She had options that would enable her to close the gap between the $ 302.70 payments that would satisfy the Ford Program and the $182 that she paid in her Chapter 13 case. This Debtor, Ms. Bene, never achieved her professional goal (for good reasons that motivated her 24 years ago), and after 12 years on an assembly line, <u>and</u> facing layoff at age 64, has <u>no</u> options.

*Melton* aside, there is also another substantial flaw in ECMC's logic. Its argument is that if Ms. Bene had chosen to complete her education rather than to care for her parents she would have succeeded to an extent that would have permitted her to repay the student loans. Perhaps she would have. Perhaps not. Maybe she would have become rich and famous, but maybe she would been injured in an accident on her way to a class and become a ward of the State. ECMC's arguments are far too speculative. This Court rejects any notion that a past choice, long ago, to terminate educational opportunities in order to care for parents more than 20 years before filing for bankruptcy relief has any bearing on a *Brunner* analysis.

Answer to question number 3. Until the Ford Program began to forgive the principal balance of the loan after 20 or 25 years of income-dependent payments, there was no need to evaluate it in the context of any of the three prongs of the *Brunner* analysis. The Court is of the impression that it was only in 2003 or so that Congress permitted forgiveness of unpaid student loan debt after a student loan debtor agrees to lower payments over a period that is two or two-and-a half times longer than the 10-year period considered by the *Brunner* court.

The current version of the Program is, of course, the second most important development in the history of the effort to make higher or specialized education broadly available in our nation. The most important is the guaranteed student loan program itself. Some subsidized. Some not. National Defense Student Loans (later called National Direct Student Loans), Stafford Loans, Pell Grants, etc., have made it possible for many millions of persons who lacked financial means to obtain higher education or specialized training, whether in a vocation or a profession.

The nurse or doctor at one's bedside.  The computer technician in one's office.

One's child's teacher.  The woman who was taught to haul a big rig that brings products to the

shelves to be stocked.  The musician in one's local concert hall.  The studio engineer, the film

maker, the community advocate, the geologist who analyzes one's land or water, the veterinarian,

the social worker, the probation or parol officer, etc.

Were it not for the federally-guaranteed student loan programs, those persons

might not be there.  It all might have been left to economic forces that might not have met the

need.  Perhaps only the wealthy or creditworthy would have been available to offer to meet such

needs.

The current version of the William D. Ford Program (with debt-forgiveness)

recognizes that not everyone is able to complete an educational program on borrowed money, and

that not everyone who does complete such a program succeeds to an extent that permits payment

of the student loans.  Prior to the current version of the William D. Ford Program, bankruptcy

was the only option for such a borrower, and even bankruptcy was not an option to a student loan

debtor who could not meet the "undue hardship" test.

The William D. Ford Program as it now exists[15] can implicate all three prongs of

---

[15]The Court notes the ways in which Congress had changed "the bargain" emphasized so much by the district
court in *Brunner*,  by changing § 523(a)(8), many times over the course of many years.

In very broad terms, the history of and amendments to 11 U.S.C. § 523(a)(8) reflect an ongoing process of
restricting dischargeability of educational loans.

11 U.S.C. § 523(a)(8) was originally enacted by the Bankruptcy Reform Act of 1978 to govern dischargeability
of student loans.  The enactment of the Bankruptcy Code repealed Section 439A of the Higher Education Act (which
previously governed student loan dischargeability) and shifted standards for student loan discharge to the Code.  11
U.S.C. § 523(a)(8) made educational loans nondischargeable unless: (1) the loan first became due five years before the

the *Brunner* test. As argued by ECMC, it would add little monthly expense for Ms. Bene, who is

marginally above the "self-sufficiency" standard, to make income-dependent payments on the

debt. And so the first prong is implicated. The second prong is implicated because the Program

is flexible, and can address what might befall Ms. Bene in the future, especially because she is 64

years of age and is facing impending job loss. The third prong is implicated because she has not

previously availed herself of the opportunities offered by the Program, but rather has sought to

discharge her student loans after paying less than $3,000 toward her student loans in the 20 years

(or more) since they first became due.


## V. CHANGES IN THE NOTION OF "POVERTY" AND "REPAYMENT PERIOD" SINCE *BRUNNER* REQUIRE CONSIDERATION BEFORE

---

bankruptcy filing (excluding deferment periods) or (2) excepting the debt from discharge would impose an undue hardship.

Those dischargeability standards remained essentially undisturbed until 11 U.S.C. § 523(a)(8) was amended in 1990. Those amendments broadened the exception to discharge beyond government loans to include governmental educational benefit overpayments and obligations to repay stipends and scholarships. Significantly, they also extended the five year dischargeability period to seven years.

Congress again amended 11 U.S.C. § 523(a)(8) in 1998 to eliminate the seven year period, making all government educational loans nondischargeable, regardless of when they first became due. That change left "undue hardship" as the only basis for a debtor to discharge educational loans or benefits. That change applied to all cases commenced after October 7, 1998, consequently applying to loans incurred before that date.

11 U.S.C. § 523(a)(8) was further amended in 2005, broadening the discharge exception to include "any other educational loan that is qualified education loan" as defined in the Internal Revenue Code.

What is a student loan borrower to do while Congress keeps changing "the bargain" on a unilateral basis?

If Ms. Bene had been cunning, she might have filed for bankruptcy relief back when the age of her student loans might have resulted in discharge without a showing of "undue hardship."

Just recently it was reported that Sallie Mae advocates going back to the notion that five to seven years of "good faith" efforts to repay a student loan suffices. (Buffalo News April 15, 2012, p. C3)

DECISION UPON QUESTIONS FOUR AND FIVE

It is possible that the Second Circuit was not aware that the district court's use of the term "poverty" in 1987 was problematic. The view that relegating a debtor to a life of "poverty" for the duration of the repayment period of a student loan would be an "undue hardship" probably seemed uncomplicated to any court at that time. However, by that time the term "poverty" had been under attack for decades[16] both inside and outside relevant government agencies. As noted before, Defendant ECMC has itself introduced evidence in this Court of what is known as the "Self-Sufficiency Standard," as adopted in the state of New York. It is higher than the H.H.S. Poverty Threshold. Ms. Bene is slightly above that standard currently, but only if one excludes what would have been the obligatory payments on the debt if repayment options today were the same as in 1987.

The Court accepts the request by ECMC that the Court take judicial notice of that standard. Looking to the sources of that standard offered by ECMC, the Court finds that it emanates from findings by the "Center for Women's Welfare." That institute has long-announced this:

**First conceived nearly five decades ago . . . the official federal poverty level has now become out-of-date.**

**The federal poverty level . . . is based on U.S.D.A. food budgets that meet minimal nutritional standards. Because families in the 1950's spent an**

---

[16]A nine-page summary of over 60 years of research (as of 1994) regarding the elasticity of the poverty line, written by Gordon Fisher, can be found at http://aspe.hhs.gov/poverty/papers/elassmiv.htm.

**average of one-third of their income on food, it was assumed that multiplying**

**the food budget by three would result in an amount that would be adequate**

**to meet other basic needs as well.  Since its creation, the [Federal Poverty**

**Level] has only been updated for inflation. [Federal Poverty Level]**

**thresholds reflect the number of adults and children, but they do not vary by**

**age of children, nor by place.[17]**

.. . . . . .

*Brunner* focused on "poverty" as if that were an absolute term.  It was not.  Now this Court must discern the <u>meaning</u> of *Brunner.*  The <u>words</u> are out-of-date.

First (in this regard), this writer agrees with the <u>dissent</u> in the case of *HHS v. Smitley* (4th Cir., 2003) 347 F.3rd 109, which (to this writer) equated the first prong of *Brunner* ("minimal standard of living") to "a safe and decent standard of living," which that dissent equated with "average family . . . income of <u>twice</u> the government-set poverty figure."  (This writer has read and accepted the sources (although controversial) upon which that dissent rested its conclusion.)  For Ms. Bene, <u>twice</u> the federal poverty level would be $21,780./ yr.  She earns $22,193.60/yr., gross.  If one subtracts $5326/yr. from that to serve the student loan debt, she would pass the first prong of the *Brunner* test, <u>but for</u> the William D. Ford Program's relatively-new flexibility.  And as to the "Self-Sufficiency Standard" of $20,108, she again passes the first prong, relative to the $5326/yr. cost to pay the debt in the "standard" (i.e., non-Ford) manner.

What of the phrase "repayment period"?  The *Brunner* court at the district court

---

[17]Http://www.self sufficiency standard.org/ standard.html.

level spoke of the bargain between the student and the student loan lender.  Ms. Bene could have

had no notion of the way that the statutory and regulatory landscape of student loan debts would

change between the time she took out her last student loan in 1987 and the time that the current

version of the Ford Program took effect.

To the *Brunner* Court it was very important that a student loan be viewed as a

"bargain" between the student and the lender, but with the <u>risks</u> to be accepted by the <u>student</u>

because it was statutorily hard to discharge a student loan.  But that bargain changed from time to

time by law by numerous amendments to § 523(a)(8).  (As described at footnote 15 above,

student loans were dischargeable in bankruptcy in 1987 so long as they had been due and payable

for at least five years prior to the bankruptcy, regardless of "<u>hardship</u>."

The "bargain" of which the district court spoke in the *Brunner* case, became a

constantly-shifting "bargain" by the U.S. on a unilateral basis.  The new <u>payment</u> options are

clearly beneficial to all student loan debtors who do not need relief in this Court.  However, such

changes were not before the Circuit Court in *Brunner* in 1987.  The present Court believes that

the Circuit Court would hold that the this Debtor ought not be impossibly burdened by the

"bargain" rationale that it approved in affirming the district court's focus on that concept.

Consequently, this Court may now answer Questions 4 and 5.

<u>Answer to question number 4.</u>  Ms. Bene faces job loss, and she is 64 years of age.

She has worked on an assembly line for twelve years at an hourly wage less than $13.00/hr.  In

the Circuit decision in *Brunner* it was said that being "elderly" might satisfy the Second Prong,

but that is not what this Court rests upon.  (This writer is a bit older than Ms. Bene.)  Rather, the

Court finds that she has no prospect of financial improvement because that fact is proven by her

twelve years on an assembly line and the fact that she never obtained a degree or professional

diploma or license.[18]  (That she is 64 and faces job loss provides an alternative holding.[19] )

        Answer to question number 5.  The Debtor's parents, in 1986, transferred all of

their money to her as part of Medicaid or Medicare planning.  It was $25,000.  It was not a gift,

but constituted money earned by her for her care of them.  (This was established by a

contemporaneous affidavit in 1986.)   She chose to devote those monies to her parents' care

rather than paying off her student loans, which then totaled approximately $14,500.  (It is not

disputed that she did expend those monies for her parents' care.)

        Unless such a choice, so remote in time from any bankruptcy filing, is shown to be

somehow fraudulent or "evasive" of the student loan obligation, the Court cannot but honor such

a pre-petition choice.  If this writer were to presume to be the debtor, and bankruptcy was not

considered at the time, and this writer had to choose whether to devote what money this writer

had to the care of his invalid parents or to paying off his student loan debt right away, this writer

---

[18]Again, the fact that Ms. DeRose became a chiropractor distinguishes *DeRose* from the present case.  (This Debtor has been an assembly line worker for 12 years.  Ms. DeRose is both an R.N. and Doctor of Chiropractic.)  That is not to say that all failures to complete an educational program give a debtor a "leg up" in a *Brunner* analysis.  Most of the "non-completion" in § 523(a)(8) cases that this writer has heard in the past 20 years hinged on medical aspects of Prong 2.  Three cases come to mind because they came to trial.  One student was raped at college, dropped-out, and now makes beds at a Hampton Inn, with constant mental health care.  (Her psychiatrist testified at trial.)  Another student was a Ph.D. candidate in mathematics, had a mental breakdown, and now manages a convenience store.  The third student was diagnosed with and was undergoing treatment for bipolar disorder which limited her to low wage employment.   Other such cases were resolved before trial.  In many similar cases ECMC conceded dischargeability.  In many other cases, debtors entered the Ford Program instead of going to trial.

        Ms. DeRose will, hopefully, do well.  This Debtor, Ms. Bene, seems to have no future prospects.

[19]If a higher court finds this Court in error in its analysis here, then this court finds that Ms. Bene falls under the "elderly" satisfaction of the second prong.

would have made the same decision that Ms. Bene did twenty-five years ago when there were still hopeful prospects for her own future. Prospects that would include repayment of the student loan. No worthy son or daughter could do otherwise. (Section 523(a)(8) is different from § 523(a)(1)(c) which implicates "tax evasion," and so has implicated financial opportunities to pay the tax in the past.) See, e.g. *In re May*, 251 B.R. 714.)

She did not ask relief from this Court until twenty-five years later, after paying what she could, and even completing this Chapter 13 Plan to serve this debt alone.

## VI.  OBEDIENCE TO *BRUNNER*

The Court finds that the *Brunner* tests have been passed <u>but for</u> the changes in repayment options offered by the Ford Program. Whether this Court adopts the "totality of circumstances" test from other jurisdictions and scholarship, or adopts the "predictive model" of vertical "*stare decisis*" that this Court utilized in *In re Arway*, 227 B.R. 216,[20] the result is the same. The Court chooses the "predictive model."

The Court finds first (under the "predictive model") that the Second Circuit Court of Appeals would conclude in this case that although the <u>*Brunner Test*</u> remains strong, a bankruptcy court must, after the 1987 *Brunner Test* is otherwise satisfied, look to the "totality of circumstances" to the extent that the current flexibility of the Ford Program is to be reconciled with the <u>intent</u> of the *Brunner Test*.

---

[20]*Arway* addressed an intervening U.S. Supreme Court decision, not an intervening change in a statute or in the Code of Federal Regulations.

Alternatively, the Court finds that *Brunner* is totally consistent with this Decision, given the evolution of words, and the growth of options for "satisfaction" (without "repayment") of student loans.

The statute itself obviously supposed a dynamic ("living") definition of "hardship." This Court finds that the Circuit Court in *Brunner* did so too.[21]

CONCLUSION

The words used 25 years ago in a binding decision of a higher court are subject to exegesis when the words are not legal terms of long standing.

A.  When the Court adjusts for predictive changes in the *Brunner* Court's understanding of the sociological terms "poverty" and "minimal standard of living," and recognizes that the "repayment period" was 10 years in 1987 and now is 25 years, the Court finds that the Debtor has passed the *Brunner* test, but for interposition of the Ford Program changes that substitute "satisfaction" for "repayment."

B.  This Court predicts that the Second Circuit would de-emphasize its focus on "the bargain" between a student loan borrower and the government, given the many ways in which the government has unilaterally changed its position in the past 25 years, and may re-shift in the Debtor's favor.

C.  This Court predicts that the Second Circuit would look first to the *Brunner* test without regard to the current Ford Program options, and then look at those options only if a

---

[21]Again, if this decision fails on all other grounds, this Court finds that Ms. Bene is "elderly."

debtor passed the original *Brunner* Test.

D.  This Court predicts that when a debtor passes the *Brunner* Test <u>but</u> <u>for</u> the Ford options, the Second Circuit would adopt a "totality of circumstances" test.

E.  This Debtor has passed the *Brunner* Test, and now must face the "totality" presented by the current version of the Ford Program.

F.  The following facts satisfy the "totality test:"

1.  She is 64 and facing job loss.

2.  She never had a profession.[22]

3.  She has no debt other than 24-year-old student loan debt.

4.  She gave up educational opportunities in order to care for her ill parents two decades ago.

5.  She lives an austere life.

6.  She has worked on an assembly line for 12 years at less than $13.00/hr. leading up to trial.

7.  She never completed her education, and so has no options for higher income now.

8.  She paid little toward her student loans, but paid what she could.

9.  The $25,000 payment from her parents in 1986 could have paid-off her student loans, but she used it to care for her parents.  There is nothing culpable

---

[22]Ms. DeRose was an R.N. earning over $30,000 per year before she decided (at age 45) to borrow to become a chiropractor.

about that in the Bankruptcy Code.

10.  Finally, *Brunner* involved a debtor starting out on her career.  (So did DeRose,

albeit at age 50.)  This Debtor is at the end of her "rope" at age 64, facing job

loss and no prospects other than Social Security.

The 1978 legislative history regarding efforts to discharge student loan debt

concerned "abuses" of the "bargain."  (See fn. 15 above)

There is no abuse here.

To return to an earlier part of this Decision, <u>Collier</u> warned that changes in the

Ford Program ought not to be viewed as an implied repeal of 11 U.S.C. § 523(a)(8).  Rather, this

Court must "decide how much personal sacrifice society expects from individuals who accepted

the benefits of guaranteed student loans but who have not obtained the financial rewards they had

hoped to receive as a result of their educational expenditures."   (Collier on Bankruptcy, 15th

Edition ¶ 523.14[2].  Ms. Bene has satisfied that standard.

This loan must be discharged.

The parties shall bear their own costs.

The Clerk shall enter judgment for the Debtor on the merits.  The Debt to ECMC

and its assignees is discharged.

SO ORDERED.

Dated:        Buffalo, New York
              June 26, 2012

s/Michael J. Kaplan

_____
U.S.B.J.